**AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, an insurance company organized under the laws of the State of Illinois, and Lumbermens Mutual Casualty Company, an insurance company organized under the laws of the State of Illinois, Plaintiffs,**

v.

**SECO/WARWICK CORPORATION, a Pennsylvania corporation, and B.F. Goodrich Aerospace, a division of the B.F. Goodrich Company, a New York corporation, Defendants.**

No. CIV.A.02–WY–641 CB.

United States District Court,
D. Colorado.

May 1, 2003.

■

John P. Craver, Diana L. Terry, Franz Hardy, White & Steele, P.C., Denver, CO, for American Manufacturers Mutual Insurance Co. and Lumbermens Mutual Casualty Co.

Thomas L. Roberts, Michael Justin Rosenberg, Roberts, Levin & Patterson, P.C., Denver, CO, for Seco Warwick Corporation.

Victoria C. Swanson, Sears and Swanson, PC, Colorado Springs, CO, for B.F. Goodrich Aerospace.

## ORDER DENYING DEFENDANT B.F. GOODRICH'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING PLAINTIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

This declaratory judgment action was brought by two insurance companies as a result of underlying litigation over the failure of several commercial furnaces sold by their insured. The matter is before the Court on Defendants' Motion for Partial Summary Judgment and Plaintiffs' Cross–Motion for Summary Judgment. Upon reading the briefs, hearing oral argument, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### Statement of Parties and Jurisdiction

Plaintiffs and Counter–Defendants, American Manufacturers Mutual Insurance Company ("American") and Lumbermens Mutual Casualty Company ("Lum-

bermens"), are Illinois companies whose principal places of business are in Illinois. They are licensed to do business and sell insurance in Colorado.

Defendant and Counter–Plaintiff, Seco–Warwick Corporation ("Seco"), is a Pennsylvania corporation whose principal place of business is in Pennsylvania. Seco transacts business in Colorado and entered into contracts with B.F. Goodrich Aerospace in Colorado.

Defendant and Counter–Plaintiff, B.F. Goodrich Aerospace ("Goodrich"), is a division of the B.F. Goodrich Company, a New York corporation with its principal place of business in Colorado.[1]

This Court exercises diversity jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391(a).

### Background

Plaintiffs filed this declaratory judgment action to determine their rights and obligations under insurance policies that they issued. Seco was covered under: (1) a Commercial General Liability ("CGL") Policy issued by American; and (2) a Commercial Catastrophic Liability Policy issued by Lumbermens (collectively "Policies").[2] Each Policy has a limit of two million dollars. Defendants claim that Plaintiffs owe Seco indemnification up to the limits of each Policy.

The requested indemnification relates to a lawsuit filed by Goodrich against Seco

for damages allegedly incurred because of the failure of three furnaces, manufactured and delivered by Seco, to perform as specified ("underlying suit"). In the underlying suit, Goodrich originally alleged claims for breach of contract and breach of warranties under the Uniform Commercial Code. Two and a half months later, Goodrich amended its Complaint, unopposed by Seco, to assert negligence claims under the same facts. Because negligence was alleged, American provided a defense to Seco under an express reservation of rights.[3] American offered to settle the underlying suit for $300,000, but Goodrich refused, demanding $1,985,000 instead. Without Plaintiffs' approval, Seco and Goodrich entered a purported "Bashor agreement."[4] This agreement provided that Seco would pay Goodrich $5,000, admit its liability, and assign to Goodrich all of its rights to seek indemnity against Plaintiffs. Goodrich promised it would not seek further funds from Seco, and the parties agreed to submit the issue of damages to arbitration.

The arbitration took place on October 3, 2001. Only the arbitrator, a Goodrich employee, and Goodrich's counsel were present. Seco did not send representatives because American did not respond to its inquiries as to whether it should do so. The arbitrator, who was aware of the "Bashor agreement" between Goodrich and Seco, did not permit transcription of the

---

1. Goodrich claims that its designation as "B.F. Goodrich Aerospace, a division of the B.F. Goodrich Company" is incorrect. (Answer of Goodrich to Compl. for Declaratory J; Counterclaims, p. 1). Although it does not state the correct designation, apparently Goodrich would have it be "the B.F. Goodrich Company."

2. The Lumbermens Policy provides coverage in one of two situations: (1) where there is coverage under the American Policy and Seco's liability exceeds the limit of that Poli-

cy; or (2) where there is no coverage under the American Policy, and Seco's liability exceeds its "retained limit," which is akin to a deductible.

3. American's CGL Policy provides coverage for negligence actions against Seco, but not for breach of contract actions. (*See* Pls.' Br. in Supp. of Cross–Mot. for Summ. J., Ex. 1, p. 1 of 14).

4. *See Northland Ins. Co. v. Bashor*, 177 Colo. 463, 494 P.2d 1292 (1972).

hearing; in fact, the arbitrator sent away a court reporter that American had sent to the arbitration. On October 10, 2001, based solely on the evidence Goodrich provided, the arbitrator awarded Goodrich damages in the amount of $3,609,734, which was nearly all the damages that Goodrich sought. Defendants then requested a stipulated judgment, which was granted, in favor of Goodrich against Seco for $3,614,734. A Writ of Garnishment was issued against Plaintiffs to collect on the judgment from the Policies.

Plaintiffs brought this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, seeking a declaration that: (1) Plaintiffs have no duty to indemnify Seco for the underlying suit, or for the amount of the arbitration award or stipulated judgment; (2) Plaintiffs owe no amount of the arbitration award or stipulated judgment to either Defendant; and (3) the arbitration award and stipulated judgment are not binding on Plaintiffs, so they owe no amount to either Defendant. Goodrich, the assignee of all bad faith breach of contract claims that Seco might have against Plaintiffs, counterclaimed for breach of the duty of good faith and fair dealing by Plaintiffs, alleging the insurance companies unreasonably failed to defend and settle Goodrich's claims against Seco.

### Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court views the evidence in the light most favorable to the party opposing summary judgment. *Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir. 1996).

The party moving for summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the nonmoving party's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to establish the existence of an essential element of the claims on which it bears the burden of proof at trial. *Id.* "While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the nonmovant's claim." *Jenkins,* 81 F.3d at 990.

To satisfy this burden, the nonmoving party must go beyond the pleadings and designate specific facts to make a showing that there is a genuine issue for trial. *Ford v. West,* 222 F.3d 767, 774 (10th Cir.2000). In order to successfully resist summary judgment, there must be sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, a "mere . . . scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir.1997).

### Analysis

I. *General Legal Standards Regarding Insurance Policies.*

A. Construction of Insurance Contracts.

Insurance contracts and endorsements thereto are construed in accordance with general contract law. *FDIC v. Am. Cas. Co.,* 843 P.2d 1285, 1289 (Colo.1992); *Harper v. Gulf Ins. Co.,* No. 01–CV–201–J,

2002 U.S. Dist. LEXIS 24492, *18–19 (D.Wyo. Dec. 20, 2002) (explaining that endorsements are writings added to an insurance contract and are construed as embodied in the contract). Construction of an insurance contract is a question of law to be determined by the court. *United States Fid. & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 442 (D.Kan. 1990) *aff'd* 999 F.2d 489 (10th Cir.1993); *Safeco Ins. Co. v. Robertson*, 994 P.2d 488, 490 (Colo.App.1999).

■ If an insurance policy is clear and unambiguous, it should be enforced according to its plain terms. *FDIC v. Am. Cas. Co.*, 843 P.2d at 1290. In such a case, the court will look to the language of the policy to determine the intent of the parties and construe the policy according to its terms to give effect to that intent. *Robertson*, 994 P.2d at 490. The Colorado Supreme Court has repeatedly cautioned that "[c]ourts are not to rewrite or limit unambiguous policy provisions by strained construction, ... or force an ambiguity in order to resolve it against an insurer. An insurer cannot be held liable beyond the scope of risks which have been clearly covered in the insurance policy." *City of Arvada v. Colo. Intergovernmental Risk Sharing Agency*, 988 P.2d 184, 186 (Colo. App.1999) (citing *Parrish Chiropractic Centers P.C. v. Progressive Cas. Ins. Co.*, 874 P.2d 1049 (Colo.1994); *Kane v. Royal Ins. Co.*, 768 P.2d 678 (Colo.1989)).

■ If the terms of an insurance contract are ambiguous, the court should construe the policy against the insurer and in favor of coverage. *FDIC v. Am. Cas. Co.*, 843 P.2d at 1290; *Fire Ins. Exch. v. Bentley*, 953 P.2d 1297, 1300 (Colo.App.1998). Whether the insurance contract is ambiguous is a question of law. *Robertson*, 994 P.2d at 490. A term or clause in an insurance policy is ambiguous if "it is reasonably susceptible to different meanings." *Compass Ins. Co. v. City of Littleton*, 984

P.2d 606, 619 (Colo.1999) (quoting *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo.1990)). However, the mere fact that the parties disagree about the meaning or scope of an insurance policy provision does not create an ambiguity. *FDIC v. Am. Cas. Co.*, 843 P.2d at 1290.

Whether the disputed insurance policy is ambiguous or not, when the facts in the case are admitted or uncontroverted, the court may determine whether the terms of the insurance policy are applicable to the facts at hand. *Morrison Grain Co.*, 734 F.Supp. at 442.

B. Insurance Policy Exclusions.

■ For an insurance policy exclusionary clause to be enforced it must be drafted in clear and specific language. *Prudential Prop. & Cas. Co. v. LaRose*, 919 P.2d 915, 917 (Colo.App.1996). To benefit from an exclusionary clause, the insurer must establish that the exclusion applies and is not subject to any other reasonable interpretation. *Am. Family Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 954 (Colo.1991). In sum,

[t]he insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusion in the insurance policy. An insurer is not excused from its duty to defend unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured.

*Compass Ins. Co.*, 984 P.2d at 614. If "there is no duty to defend, there is no duty to indemnify." *City of Arvada*, 988 P.2d at 186.

■ In Colorado, "ambiguities in the provisions of exclusionary clauses of an insurance contract must be construed in favor of the insured." *Worsham Contr. Co. v. Reliance Ins. Co.*, 687 P.2d 988, 990 (Colo.App.1984). Colorado courts find that

the general grant of coverage prevails where there are contradictions between exclusions and exceptions to exclusions. *Simon v. Shelter Gen. Ins. Co.,* 842 P.2d 236, 239–40 (Colo.1992).

### C. Forfeiture of Coverage by Breach of a Cooperation Clause.

 "Recovery under an insurance policy may be forfeited when, in violation of a policy provision, the insured fails to cooperate with the insurer in a material and substantial respect." *Hansen v. Barmore,* 779 P.2d 1360, 1364 (Colo.App.1989) (internal quotation marks and citation omitted). "The purpose of a cooperation clause is to protect the insurer in its defense of claims by obligating the insured not to take any action intentionally and deliberately that would have a substantial, adverse effect on the insurer's defense, settlement, or other handling of the claim." *State Farm Mut. Auto. Ins. Co. v. Secrist,* 33 P.3d 1272, 1275 (Colo.App.2001).

### D. The Duty to Defend.

 In Colorado, an "insurer's duty to defend arises when the underlying complaint alleges facts that might fall within the policy's coverage." *City of Arvada,* 988 P.2d at 186. Moreover, if "those allegations potentially come within policy coverage, or if there is even some doubt, the insurer must defend the claim. The insurer must defend against all claims if some potentially covered claims are alleged." *TerraMatrix, Inc. v. United States Fire Ins. Co.,* 939 P.2d 483, 486 (Colo.App.1997).

 The Colorado Supreme Court has noted that an "insurer seeking to avoid its duty to defend an insured bears a heavy burden." *Compass Ins. Co.,* 984 P.2d at 613. This burden, "necessary for an insurer to prevail on a duty-to-defend claim[,] holds true in the specific context of a determination of whether insurance coverage does not exist because one of the policy's exclusions applies." *Id.*

### II. *Application.*

#### A. Absence of an "Occurrence" Causing "Property Damage," and Policy Exclusions.

 The Policies provide coverage for "bodily injury" and "property damage" to Goodrich caused by an "occurrence" for which Seco was legally obligated to pay. (Pls.' Br. in Supp. of Cross–Mot. for Summ. J. ("Pls.' Br."), Ex. 1 ("American Policy"), p. 1 of 14; Am. Submission of Lumbermens Ins. Policy Exs. Regarding Pls.' Resp. to Goodrich Mot. for Partial Summ. J. and Pls.' Cross–Mot. for Summ. J., Ex. A1 ("Lumbermens Policy"), p. 2 of 17). "Occurrence" is defined in the Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (American Policy, p. 13 of 14; Lumbermens Policy, p. 15 of 17). Under Colorado law, an "accident" is an "unanticipated or unusual result flowing from a commonplace cause." *Fire Ins. Exch. v. Bentley,* 953 P.2d 1297, 1301 (Colo.App.1998). However, "an occurrence does not include the normal expected consequences of poor workmanship." *Bangert Bros. Constr. Co. v. American Ins. Co.,* 66 F.3d 338, 1995 WL 539479, at *2, 1995 U.S.App. LEXIS 25702, at *8 (10th Cir.1995). An occurrence does not arise out of poor workmanship because the "policy is not intended to serve as a performance bond or a guaranty of goods or services. Its purpose is to protect the insured from liability for damages to property *other than his own work or property* that is caused by the insured's defective work or product." *Hartford Accident & Indemnity Co., et al. v. Pacific Mut. Life Ins. Co.,* 861 F.2d 250, 253 (10th Cir.1988) (emphasis in original) (citations omitted). Therefore, liability for breach

of contract is not covered under the Policies. (American Policy, p. 1 of 14; Lumbermens Policy, p. 5 of 17).

Goodrich lists thirteen events or conditions that it argues constitute "occurrences" under the Policies. (See Goodrich's Opening Br. in Supp. of Mot. for Partial Summ. J. ("Goodrich Br."), pp. 18–20). However, these events or conditions all arise from Seco's alleged breach of contract due to the furnaces' failure to perform to contract specifications, and as a result of poor workmanship. (See Pls.' Br., Exs. 12, 15, 16). Therefore, they are not covered "occurrences" under the Policies.[5]

■ Goodrich's negligence claims, which it alleged only after amending its complaint in the underlying suit (see Pls.' Br., Exs. 4, 5), cannot create coverage under the Policies. See DCB Constr. Co., Inc. v. Travelers Indemnity Co. of Ill., et al., 225 F.Supp.2d 1230 at 1232 (D.Colo. 2002) (holding that a construction company's "efforts to turn that breach [of contract] into a covered 'accident' under the general liability insurance policy by bootstrapping on its subcontractor's 'negligence' in designing the walls contrary to specifications are unavailing"). In Town of Alma v. Azco Constr., Inc., the Colorado Supreme Court held that:

> [N]o cause of action lies in tort when purely economic damage is caused by negligent breach of a contractual duty. This economic loss rule prevents recovery for negligence when the duty breached is a contractual duty and the

harm incurred is the result of failure of the purpose of the contract.

10 P.3d 1256, 1261 (Colo.2000). Furthermore, a "breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie." Id. at 1262. "Examining the type of damages suffered may assist in determining the source of the duty underlying the action (e.g., most actions for lost profits are based on breaches of contractual duties while most actions involving physical injuries to persons are based on common law duties of care)." Id. at 1263.

In this case, the damages Goodrich claims are its economic losses. Goodrich claims damages for: (1) costs to replace damaged parts for Furnaces 15A & 15B and cost of modifications to cause those furnaces to become functional; (2) additional labor costs for modification and replacement of parts because of damage to Furnace 15B components; (3) consulting, monitoring, and engineering costs to render Furnace 15B functional; (4) the difference in value between the furnaces as delivered and the amount paid by Goodrich; (5) carbonization outsourcing;[6] (6) transportation required for outsourcing; and (7) costs to process Duracarb in a two-step process, rather than the one-step contemplated in the specifications. (Pls.' Br., Ex. 24, pp. 2–4). These categories of damages are economic losses and consequential damages arising out of and flowing from Seco's alleged breach of contract.

---

5. Goodrich alleges several instances of the release or escape of toxic gases, and claims that in one instance, two Goodrich furnace operators were injured as a result of the escape of toxic residual gas from Furnace 15A. (Goodrich Br., p. 19). However, Goodrich has claimed no damages as a result of these alleged bodily injuries, and it has provided the Court with no evidence in support of its assertion. Furthermore, the release of toxic

gases is addressed under the "Pollution" exclusion. (American Policy, p. 2 of 14; Lumbermens Policy, pp. 4, 6–7 of 17).

6. Carbonization outsourcing consists of the use of outside vendors for carbonization production. (See Goodrich's Mem. in Reply to Pls.' Resp. to Goodrich's Mot. for Partial Summ. J., p. 8).

Even the losses claimed for physical damage to the furnaces themselves are not covered by the Policies. " 'Property damage' to 'your [Seco's] product' arising out of it or any part of it" is specifically excluded. (American Policy, p. 4 of 14; Lumbermens Policy, p. 7 of 17). Indeed, Goodrich has claimed no tangible "property damage" apart from this excluded damage to Seco's furnaces. Goodrich argues that such property damage exists in the "loss of use of furnace capacity resulting in carbonization outsourcing totaling $649,587." (Goodrich's Mem. in Reply to Pls.' Resp. to Goodrich's Mot. for Partial Summ. J., p. 8). Even if such damage could be considered property damage, rather than purely economic loss, it falls under the "Damage to Impaired Property or Property Not Physically Injured" exclusion. This exclusion provides that the Policies do not apply to:

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
> 1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> 2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

(American Policy, p. 4 of 14; Lumbermens Policy, p. 7 of 17).

Goodrich experienced neither an "occurrence" nor "property damage" as defined in the Policies. Additionally, if Seco had desired the coverage provided by a performance bond, or by errors and omissions insurance coverage, it could have purchased such coverage; however, Seco chose not to purchase such coverage." (*See* Pls.' Br., Ex. 23, pp. 3–4). Neither did Goodrich require Seco to have a bond securing performance. (*See id.*, p. 4). Under existing law, this Court cannot permit Defendants to transform commercial liability policies into performance guaranties by merely alleging negligence. In the absence of a qualifying "occurrence" causing damage to property other than Seco's property, the Policies do not apply.

## B. The Cooperation Clause.

Each Policy contains a cooperation clause providing: "You and any other involved insured must: ... Cooperate with us in the investigation or settlement of the claim or defense against the 'suit.' " (American Policy, form CG 79 72, p. 2 of 3; Lumbermens Policy, p. 12 of 17). Seco breached this Policy provision by entering into a settlement agreement without Plaintiffs' consent.

This "Bashor agreement" was not truly the type of agreement permitted under *Northland Ins. Co. v. Bashor*, 177 Colo. 463, 494 P.2d 1292 (1972). In *Stone v. Satriana*, the Colorado Supreme Court stated that a "Bashor agreement is a settlement reached between opposing parties after a judgment has been obtained," whereby the "prevailing party agrees not to execute on the judgment in exchange for the defendant's agreement not to appeal the judgment and instead to pursue claims against third parties (and share any recovery with the original plaintiff)." 41 P.3d 705, 708 n. 2 (Colo.2002). The agreement between Seco and Goodrich was not reached after a judgment was obtained, and thus it was not a true Bashor agreement. Where, as here, the party claiming a right to indemnity enters into a stipulated judgment with the claimant, and enters an agreement that absolves itself of further liability, the claimant has no right of action against the supposed indemnitor. *See Serna v. Kingston Enters.*, 72 P.3d 376 at 380–81 (Colo.App. 2002). For this alternative reason, Plaintiffs owe no duty to indemnify Seco under the Policies.

## C. Goodrich's Bad Faith Counterclaim.

Goodrich asserts a counterclaim against Plaintiffs for breach of the duty of good faith and fair dealing in failing to defend and settle the underlying suit. (Answer of Goodrich to Compl. for Declaratory J; Counterclaims, p. 12). At the outset, it is clear that this counterclaim is wholly inapplicable to Lumbermens, which was the excess insurance carrier. The Lumbermens Policy provides: "In the event the duty of the underlying insurer to defend the insured against a 'suit' ceases solely because the applicable limit of insurance is used up in the payment of judgment or settlements, then we shall assume the duty for such defense." (Lumbermens Policy, p. 1 of 17). This condition precedent never occurred in the present case. Furthermore, Lumbermens could not have breached a duty to settle the underlying suit, because Seco never tendered the claim to Lumbermens.

With respect to American, it provided Seco a defense under an express reservation of rights because Goodrich alleged negligence in its amended complaint against Seco in the underlying suit. Goodrich alleges that American abandoned its duty to defend and settle the underlying suit on behalf of Seco. The only evidence that Goodrich presents to this effect is the Affidavit of John W. Cook. (*See* Goodrich's Mem. in Resp. to Pls.' Cross–Mot. for Summ. J., Ex. A). This affidavit establishes, at most, that American was nonresponsive to inquiries on behalf of Seco regarding whether Seco should send representatives to the arbitration on damages, which was held after the purported "Bashor agreement" was reached between Seco and Goodrich. Mr. Cook's Affidavit does not set forth any material facts that American abandoned Seco with respect to

its duty to defend Seco. (*See id.*). American had no duty to arbitrate unless the arbitration was compulsory or entered into with American's consent. (*See* American Policy, pp. 1, 13–14 of 14). In this case, the arbitration was not compulsory, and American did not consent to the "Bashor agreement," nor to the arbitration. Therefore, it had no duty to represent Seco in the arbitration.

Moreover, Mr. Cook's Affidavit does not establish that American abandoned Seco with respect to the settlement of the underlying suit. American only had a duty to represent Seco to the extent that Seco was liable for damages based on negligence. American offered Goodrich $300,000 to settle the underlying suit, but Goodrich refused, later demanding $1,985,000.[7] (*See* Pls.' Br., Ex. 23, p. 5). Since the vast majority of Goodrich's claimed damages were for breach of contract, American's settlement offer was reasonable. Again, American had no duty to arbitrate the issue of damages, especially after Seco entered an agreement admitting liability to Goodrich.

Defendants have presented no evidence which would raise a genuine issue of material fact that Plaintiffs breached the duty of good faith and fair dealing in failing to defend and settle the underlying suit.

### *Conclusion*

For the aforementioned reasons, Plaintiffs' Cross–Motion for Summary Judgment is **GRANTED**, and Defendant Goodrich's Motion for Partial Summary Judgment is **DENIED**. Therefore: (1) Plaintiffs have no duty to indemnify Seco for the underlying suit between Seco and Goodrich, or for the amount of the arbitration award or stipulated judgment; (2)

---

**7.** Interestingly, Goodrich's settlement demand was much less than the amount Goodrich eventually obtained through the stipulated judgment by the arbitrator, which was $3,614,734.

Plaintiffs owe no amount of the arbitration award or stipulated judgment to either Defendant; (3) the arbitration award and stipulated judgment are not binding on Plaintiffs, and Plaintiffs owe no amount to either Defendant; and (4) Goodrich's bad faith counterclaim is **DISMISSED.**